**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

IN RE:       **SHEENA SMITH,**                    **Case No. 07-30540-pp**

                        **Debtor.**                        **Chapter 13**

---

### DECISION AND ORDER SUSTAINING GMAC'S OBJECTIONS TO THE FIRST AND SECOND AMENDED PLANS.

---

The debtor purchased a Chevrolet Tahoe within 910 days of filing for Chapter 13 protection. Creditor GMAC holds a security interest in the Tahoe. GMAC has objected to the debtor's first and second amended Chapter 13 plans, because both plans propose to cram down GMAC's claim to the value of its collateral. GMAC alleges that it has a "purchase money security interest" in the Tahoe, and therefore the hanging paragraph of 11 U.S.C. § 1325(a) prohibits the debtor from cramming down its claim. The debtor responds that the hanging paragraph does not apply. She maintains that GMAC does not have a purchase money security interest in her *entire* obligation to GMAC, due to the fact that the obligation includes a "negative equity" component and costs for gap insurance, a service contract, and other fees. She argues that the presence of these components deprives GMAC's security interest of its "purchase money" nature, such that the protections of the hanging paragraph do not prohibit her from cramming down GMAC's claim. For the reasons that follow, the Court sustains GMAC's objections to the debtor's first and second amended plans.

1

## I.  FACTUAL BACKGROUND

On July 3, 2006, the debtor purchased a 2007 Chevrolet Tahoe from Schmitt Chevrolet ("the dealer").  (Exhibit 2 at 1.)  The purchase price of the Tahoe was $38,039.00.  (Exhibit 2 at 1.)  To make the purchase, the debtor entered into a retail installment sales contract with the dealer.  The contract provided the debtor with total financing in the amount of $47,541.11 at an interest rate of 8.9%.  (Exhibit 2 at 1.)

At the time of the purchase, the debtor already owned a motor vehicle, but she had not paid it off.  That vehicle had an outstanding loan amount of $14,707.50. (Exhibit 2 at 1.)  As part of the purchase of the Tahoe, the debtor traded in her old car, and the dealer credited her $9,700 in exchange.  This left the debtor with a balance of $5,007.50 due and owing on the outstanding loan for the trade-in.  That amount–the amount left due and owing on the outstanding loan for the trade-in–is known as "negative equity."

The retail installment sales contract on the Tahoe included financing of $5,007.50 to pay off the negative equity due on the trade-in.  In addition, the contract included financing of $595.00 for gap insurance[1], $1,895 for a service contract, and $2,000.62 for administrative fees, licensing fees, and taxes.  (Exhibit 2

---

[1] "Gap insurance" insures a car owner for the difference between what the owner owes on the vehicle and what the insurer says the car is worth.  While a vehicle depreciates the moment the new owner drives it off the lot, that depreciation does not reduce the amount the new car owner owes on her newly-minted car loan.

at 1-2.)  The dealer later assigned the retail installment sales contract to GMAC.

The debtor subsequently filed a Chapter 13 bankruptcy petition.  Shortly thereafter, GMAC filed a proof of claim in the amount of $46,055.63. In both her first and second amended Chapter 13 plans, the debtor valued GMAC's allowed secured claim in the amount of $37,000, and its total claim in the amount of $45,546.60.  (Docket Numbers 30; 35.)  The debtor proposed to pay GMAC only $37,000.00 of its claim, at 8.5% interest.  (Docket Number 30; 35.)

GMAC objected to both plans, arguing that because the debtor bought the Tahoe within 910 days of filing, GMAC's claim as of the date of the petition was fully secured by virtue of 11 U.S.C. § 1325(a) (hanging paragraph), and thus had to be paid in its entirety.  (Docket Numbers 32; 40.)

The debtor responded that, because it included negative equity, gap insurance, administrative fees, a service contract, and taxes, the debt she owed pursuant to the financing agreement did not constitute a "purchase money security interest," and therefore was not protected by the anti-cram down provision in the hanging paragraph in § 1325(a).  GMAC replied that the entire debt constituted a "purchase money security interest," and therefore that the hanging paragraph in § 1325 prevented the debtor from cramming down its claim.

## II.    LEGAL ANALYSIS

## GMAC HAS A PURCHASE MONEY SECURITY INTEREST IN THE TAHOE; THEREFORE, THE DEBTOR CANNOT CRAM DOWN GMAC's CLAIM.

1.    *The Hanging Paragraph of § 1325(a) Protects Creditors With "Purchase Money Security Interests" In Vehicles Purchased Within 910 Days of the Petition Date.*

Section 506(a)(1) of the Bankruptcy Code allows a debtor to bifurcate a creditor's claim into secured and unsecured portions.  The claim is secured "to the extent of the value of [the] creditor's interest in the estate's interest" in the property, and unsecured as to any balance in excess of that value.  The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), however, excepted one particular group of claims from the application of § 506.  In what has become the infamous "hanging," or "unnumbered," paragraph at the end of § 1325(a), Congress provided:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a *purchase money security interest securing the debt that is the subject of the claim*, the debt was incurred within the 910-day preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor . . . .

11 U.S.C. § 1325(a)(hanging paragraph)(emphasis added).

This "hanging paragraph," then, protects certain creditors from having their claims bifurcated, or "crammed down."  In order to obtain the protection of the hanging paragraph, a creditor's claim must meet three requirements: (1) there must be "a purchase money security interest securing the debt that is the subject of the

4

claim;" (2) the debt must have been incurred within 910 days prior to the date on which the debtor filed the bankruptcy petition; and (3) the debt must be secured by a motor vehicle that was acquired for the debtor's personal use.  Id.

In the current case, the parties do not dispute that the debtor incurred her debt to GMAC well within 910 days prior to the date she filed for bankruptcy.  Nor is there any evidence that the debtor acquired that motor vehicle for anything other than her personal use.  The sole issue before the Court is whether GMAC has "a purchase money security interest securing the debt that is the subject of the claim." Id.

2.    *The Bankruptcy Code Does Not Define the Term "Purchase Money Security Interest."*

Those familiar with secured transactions know a "purchase money security interest" when they see it.  When a lender advances money to someone who wants to buy a car, and the person uses that money to buy the car, the lender has a text-book example of a "purchase money" security interest.  The lender provided the car buyer with "purchase money"–money to purchase something.  The "something" the buyer purchases with that money is the "collateral" which "secures" the lender's interest in the car.  The lender retains "ownership" of the car until the borrower pays the "purchase money" back, and the borrower gets to use the car in the meantime.

The Bankruptcy Code, however, does not define the term "purchase money

security interest" for bankruptcy purposes,[2] even though it uses that term in § 1325. Perhaps this lack of a definition would be irrelevant–and a general understanding of the term suffice–had not debtors begun, in the wake of the implementation of BAPCPA, to raise the issue involved in this case.  If the only way people financed the purchase of cars was by borrowing the amount listed on the sticker the dealer pasted to the car's window, paying that entire amount to the dealer, and then paying that amount back to the lender over time, there would be little question that lenders would hold "purchase money security interests" in the purchased vehicles.

But the specific issue raised in this case–and in a number of others since BAPCPA's implementation–is this: when the car buyer borrows some money to pay for the new car, and also borrows some money to pay for other things–including the existing loan on her *previous* car, so that she can trade the old car in to offset the cost of the new car, does the fact that some of the money she borrows goes to pay off these other things destroy the "purchase money" nature of the lender's security interest?

To answer this question, courts have looked for statutory guidance as to what makes a security interest a "purchase money" security interest.  Because the Bankruptcy Code does not define "purchase money security interest," courts have had to look outside the Code for the answer to this question.

---

[2] See 11 U.S.C. § 101(42A) through (44) (defining the terms "production payment," "purchaser," and "railroad," respectively.)

3.      *Illinois State Law Defines "Purchase Money Security Interest" To Include Obligations for Taxes, Fees, Gap Insurance, Service Contracts and Negative Equity.*

The United States Supreme Court has held that "[p]roperty interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." Butner v. U.S., 440 U.S. 48, 55 (1979); *see also* In re Wright, 492 F.3d 829, 832-33 (7th Cir.2007) ("*Butner* holds that . . . rights under state law count in bankruptcy unless the Code says otherwise.  Creditors don't need § 506 to create, allow or recognize security interests, which rest on contracts (and the [Uniform Commercial Code]) rather than federal law. . . .").  In this case, then, Illinois law controls whether GMAC has a purchase money security interest in the amount financed to the debtor.

A.      The Illinois Version of the Uniform Commercial Code Defines "Purchase Money Security Interest."

In its version of the Uniform Commercial Code ("UCC"), Illinois law defines the term "purchase-money security interest."  *See* 810 ILL. COMP. STAT. ANN. ACT 5. The heading of that section of the Illinois statutes is "Purchase-money security interest; application of payments; burden of establishing."  Id. at § 5/9-103.  What follows, frustratingly, is a chain of definitions–each appearing, like the *ouroboros* (that ancient symbol of the snake swallowing its own tail), to refer back to some term from another definition in the chain.

7

The statute begins by announcing that "[a] security interest in goods is a purchase-money security interest: . . . to the extent that the goods are *purchase-money collateral* with respect to that security interest." 810 ILL. COMP. STAT. ANN. § 5/9-103(b)(1) (emphasis added).  Thus, GMAC has a purchase money security interest in the Tahoe to the extent that the Tahoe is "purchase-money collateral."  What constitutes "purchase money collateral"?  The statute tells us that "'purchase-money collateral' " is "goods or software that secures a *purchase-money obligation* incurred with respect to that collateral." 810 ILL. COMP. STAT. ANN. § 5/9-103(a)(1) (emphasis added).  The Tahoe certainly is a "good."  But does it secure a purchase-money obligation?  The statute helpfully explains that a "purchase money obligation" is "an obligation of an obligor *incurred as all or part of the price of the collateral* or for *value given to enable the debtor to acquire rights in or the use of the collateral* if the value is in fact so used." 810 ILL. COMP. STAT. ANN. § 5/9-103(a)(2) (emphasis added).

So–the debtor in this case is the "obligor."  She has incurred an "obligation" to GMAC for the "collateral"–the Tahoe.  If she incurred that obligation as "all or part of the price" of the Tahoe, or if she incurred it "for value given to enable" her to acquire ownership rights in the Tahoe, then GMAC does, indeed, have a "purchase money security interest" in the Tahoe under Illinois law.  Some of the money the debtor borrowed went to the dealer to pay the sticker price of the Tahoe (or whatever lower price the debtor may have negotiated).  Unquestionably, she

8

incurred her obligation for that part of the debt "as . . . part of the price of the collateral." Id.  If the debtor had not obligated herself to repay the lender the money it lent her to pay the amount the dealer charged her for purchasing the Tahoe, she would not have been able to acquire an ownership interest in the Tahoe.

But what about the obligation that the debtor incurred to the lender for the money it lent her to pay for (a) the negative equity on her previous vehicle; (b) gap insurance; (c) administrative fees; (d) a fee for a service contract; and (e) taxes to the financing agreement for the Tahoe?  Put another way, under 810 ILL. COMP. STAT. ANN. § 5/9-103(a)(2), was the debtor's obligation to the lender for the money it lent her to pay these additional charges "incurred as all or part of the *price of the collateral* or for *value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used*"? Id. (emphasis added).

This question begs two further questions.  What is the "price" of the collateral?  How does one tell if the "value" given was given to "enable" the debtor to acquire rights in, or the use of, the car?  The Illinois UCC does not define the term "price of the collateral."  Is the "price" of a car the sticker price–generally the manufacturer's suggested retail price–or does it include other amounts?

    B.    <u>Comment 3 to the Illinois UCC States that Finance Charges, Interest, Administrative Fees, Licensing Fees and Taxes Are Part of a "Purchase Money Security Interest."</u>

The comments to the Illinois UCC indicate that there is more to "price" than just the manufacturer's suggested retail price.  The comment to § 5/9-103 reads as

follows:

> Subsection (a) defines "purchase-money collateral" and "purchase-money obligation." These terms are essential to the description of what constitutes a purchase-money security interest under subsection (b). As used in subsection (a)(2), the definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, *sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations*.

> The concept of "purchase-money security interest" requires a close nexus between the acquisition of collateral and the secured obligation. Thus, a security interest does not qualify as a purchase-money security interest if a debtor acquires property on unsecured credit and subsequently creates the security interest to secure the purchase price.

810 ILL. COMP. STAT. ANN. § 5/9-103 (Comment 3) (emphasis added).

Comment 3 directly states, then, that finance charges, interest, administrative fees, licensing fees and taxes are part of the "price" of the collateral, and constitute "value given to enable" the purchaser to acquire ownership of the collateral.  The fact that the debtor is obligated to GMAC for money lent to pay these charges, therefore, does not deprive GMAC's interest of its status as a purchase money security interest.

The comment does not directly state, however, whether obligations for expenses such as negative equity, gap insurance or service contract fees are part of the "price" of the collateral.  GMAC urges the Court to look to how another, similar Illinois statute–the Illinois Motor Vehicle Retail Installment Sales Act ("MVRISA")–defines "price" for guidance in answering this question.

10

C.     <u>The Illinois MVRISA Is Helpful In Determining Whether Loans to Pay for Gap Insurance, Service Contracts and Negative Equity are Part of a "Purchase Money Security Interest."</u>

      i.     The Illinois MVRISA Defines Terms Similar to Those Used in the Illinois UCC.

The MVRISA is the Illinois statute that regulates the installment sales of motor vehicles, and provides penalties for violating its terms.  It has sections which define certain terms used in the imperative portion of the statute.  Subsection 2.6, for example, defines the term "cash sale price" as

> the price stated in a retail installment contract for which the seller in good faith and in the regular course of business would have sold to the buyer, and the buyer would have bought from the seller, the motor vehicle if the sale had been a sale for cash.  The cash sale price may include any taxes, registration, certificate of title, license, and cash sales prices for accessories and their installation and for delivering, servicing, repairing or improving the motor vehicle.

815 ILL. COMP. STAT. ANN. § 375/2.6.

Subsection 2.8 defines the term "amount financed."  The definition of this term is

> the cash sale price of the motor vehicle plus all other charges individually itemized, which are included in the amount financed, including the amount actually paid or to be paid by the seller pursuant to an agreement with the buyer to discharge a security interest, lien interest, or lease interest on the property traded in, but which are not a part of the finance charge, minus the amount of the buyer's down payment in money or goods.

815 ILL. COMP. STAT. ANN. § 375/2.8.

And subsection 2.9 defines "finance charge."  The "finance charge" is the "sum of all charges payable . . . by the buyer and imposed . . . by the seller as an incident

11

to or as a condition of the extension of credit." 815 ILL. COMP. STAT. ANN. § 375/2.9.
Such charges, according to § 2.9, include interest, service charges, loan fees or
points, appraisal fees and fees for insurance.

These definitions help when one looks at the "guts" of the MVRISA–its
requirements for what lenders have to disclose to customers who are buying cars on
retail installment contracts. Subsection 5 of the statute dictates that every such
retail installment contract must disclose "the *cash price* of the motor vehicle, using
the term 'cash price.'" 815 ILL. COMP. STAT. ANN. § 375/5(1)(emphasis added). The
contract then must disclose the amount the customer puts down for a down
payment, broken out into "down payment in money, using the term 'cash down
payment'; down payment in property, using the term 'trade-in'; and the sum, using
the term 'total down payment'." 815 ILL. COMP. STAT. ANN. § 375/5(2). The statute
next requires the lender to subtract the down payment from the cash price, and to
list the resulting number as the "unpaid balance of cash price." 815 ILL. COMP.
STAT. ANN. § 375/5(3). Then the contract must list any other charges that are
"included in the amount financed but which are not part of *the finance charge*." 815
ILL. COMP. STAT. ANN. § 375/5(4) (emphasis added). The sum of the "unpaid balance
of the cash price" and the other charges referenced in subsection 5(4) must be listed
and designated the "unpaid balance." 815 ILL. COMP. STAT. ANN. § 375/5(5). From
the "unpaid balance," the lender subtracts any separate finance charges the buyer
must pay, 815 ILL. COMP. STAT. ANN. § 375/5(6), and the resulting amount is the

"*amount financed*."  815 ILL. COMP. STAT. ANN. § 375/5(7)(emphasis added).

Thus, the MVRISA lists two distinct kinds of costs involved in purchasing a car–(1) costs one pays for the car itself and the rights associated with owning and maintaining that car (such as taxes, license, registration, and service fees), and (2) costs involved in borrowing money to purchase a car–the costs of credit, such as interest, appraisal fees, fees for credit reports, etc.

The "cash sale price" is the first kind of cost–it is the amount the buyer would have paid if she had walked into the dealership and paid the entire obligation, as the expression goes, with "cash on the barrel head."  If a buyer were to walk into the dealership with cold, hard cash–and not finance anything–she would have to pay the amount on the sticker (unless she can negotiate a lower amount).  She would have to pay taxes.  She would have to pay for the license fee and the registration fee.  She would have to pay for any additional accessories.  She would have to pay for any service the vehicle needed, or for a service contract.  These are the costs of purchasing the car, and the out-of-pocket costs that go along with owning a car and maintaining it.

What the debtor would *not* have had to pay if she walked into the dealership with cash is the second kind of cost the MVRISA addresses–the costs associated with borrowing money.  She would not have paid interest, loan fees or points.  She would not have paid for the financing company's cost of having the car appraised. She would not have paid the cost of the lender obtaining her credit report.

The MVRISA divides this second category of costs into two further sub-categories.  First, it breaks out the "finance charge"–which consists of the costs that are a condition of buying on credit, such as interest, service charges, loan fees or points, appraisal fees and fees for insurance.  Second, it breaks out any other charges that, while they aren't part of the "cash price" or "the finance charge," are nonetheless part of the obligation the buyer has incurred–"including the amount actually paid or to be paid by the seller pursuant to an agreement with the buyer to discharge a security interest, lien interest, or lease interest on the property traded in."  815 ILL. COMP. STAT. ANN. § 375/2.8.  When one combines the "cash sale price," the "finance charge," and these "other" charges, one gets the "amount financed."  Id.

> ii.    It is Appropriate to Read the MVRISA *In Pari Materia* With the Illinois UCC.

GMAC states that the Illinois MVRISA "clearly requires the inclusion of negative equity, insurance and service contracts as part of the 'amount financed' in a retail installment contract."  (GMAC's Br. at 17.)   GMAC reasons that if one reads the MVRISA *in pari materia* with the Illinois version of the UCC, one must conclude that because the "amount financed" under the Illinois MVRISA includes negative equity, then the "price" of a vehicle under the Illinois UCC definition of "purchase money security interest" also must include negative equity.

The phrase "*in pari materia*" means "on the same subject; relating to the same matter."  BLACK'S LAW DICTIONARY 352 (2d Pocket Ed. 2001).  The doctrine of *in pari materia* is "a canon of construction that statutes that are *in pari materia*

14

may be construed together, so that inconsistencies in one statute may be resolved by looking at another statute on the same subject." BLACK'S LAW DICTIONARY 352 (2d Pocket Ed. 2001); see also Deluna v. Burciaga, 857 N.E.2d 229, 236 (Ill. 2006) ("It is appropriate statutory construction to consider similar and related enactments, though not strictly *in pari materia*. . . . We must presume that several statutes relating to the same subject are governed by one spirit and a single policy, and that the legislature intended the several statutes to be consistent and harmonious.")

The Court agrees that the Illinois version of the UCC–which governs sales–and the Illinois MVRISA–which governs the disclosures mandated in installment sales of motor vehicles–relate to similar subjects, likely are governed by a single spirit and policy, and likely were intended by the Illinois legislature to be read consistently. Indeed, Article 9 of the Illinois UCC (810 ILL. COMP. STAT. ANN. § 5/9-201(b)(2) explicitly refers to the MVRISA, stating that "[a] transaction subject to this Article is subject to any applicable rule of law, statute, or regulation which establishes a different rule for consumers, including . . . the Motor Vehicle Retail Installment Sales Act."[3]

---

[3] The MVRISA also refers to Article 9 in 815 ILL. COMP. STAT. ANN. § 375/20, which states that the parties have all the rights and remedies provided in Article 9 "with respect to default and disposition and redemption of collateral."

      iii.    Reading the Illinois UCC and the Illinois MVRISA Together
              Demonstrates that an Obligation for the Cost of Gap Insurance
              and Service Contracts is a "Purchase Money Security Interest."

The above analysis answers whether obligations for expenses such as gap insurance or service contract fees are part of the "price" of the collateral under the Illinois UCC, and thus a "purchase money security interest."  If the debtor had walked into the dealership and paid cash, rather than financing the Tahoe, she would have had to pay for the service contract.  She also would have had to pay for gap insurance, had she chosen to purchase it.  These expenses constitute costs associated with maintaining a car.  Obligations for these kinds of costs fall under the MVRISA definition of "cash price."

Comment 3 to the UCC makes clear that "price of the collateral" includes more than just the ownership costs of the car–the costs the MVRISA categorizes as "cash price."  If "price of the collateral" clearly encompasses the kinds of things the MVRISA categorizes as "cash price," and the service contract fee and the cost of the gap insurance are included in the "cash price," then the service contract fee and the cost of gap insurance constitute part of the "price" of the collateral.[4]  As such, money loaned to pay for those items constitutes a "purchase money security interest" under

---

    [4] In In re Macon, 376 B.R. 778, 782-83 (Bankr. D.S.C. 2007), the court similarly found that the inclusion of money to pay for gap insurance and an extended service contract in the amount loaned to the debtor did not destroy the "purchase money security interest" nature of the transaction.  The bankruptcy court for the Middle District of Georgia reached the same conclusion in In re Spratling, 377 B.R. 941, 945-46 (Bankr. M.D.Ga. 2007).

the Illinois UCC.

> iv.  Reading the Illinois UCC and the Illinois MVRISA Together Also Demonstrates that an Obligation for the Payment of Negative Equity is a "Purchase Money Security Interest."

The remaining question is whether the UCC "price of the collateral" includes the debtor's obligation for money GMAC lent her to pay off the lien on her previous car. This Court finds that the answer to that question is yes.

Again, the starting premise is that according to Comment 3 to § 5/9-103 of the Illinois UCC, "price of the collateral" includes more than just what the MVRISA defines as "cash price"–the cost one pays for purchasing, operating and maintaining the car. Comment 3 states that "price of the collateral" also includes some of the costs involved in borrowing money to purchase the car, such as finance charges and interest. Indeed, the Comment specifically lists finance charges and interest, and then throws in at the end the broad, catchall language "*and other similar obligations*." 810 ILL. COMP. STAT. ANN. § 5/9-103 (Comment 3)(emphasis added). The Comment, read in conjunction with the MVRISA's categorization of the costs of purchasing a car ("cash price") and the costs of borrowing money to purchase a car ("finance charge"), appears to include a broad range of charges and costs in the phrase "price of the collateral."

Similarly, the MVRISA talks about the costs of purchasing the car ("cash price"), the costs of borrowing money to purchase the car ("finance charge"), and other similar obligations ("amount financed"). In the definition of those "other,

17

similar obligations," section 2.8 (the "amount financed" section) specifically includes

> all other charges individually itemized, which are included in the amount
> financed, *including the amount actually paid or to be paid by the seller
> pursuant to an agreement with the buyer to discharge a security interest,
> lien interest, or lease interest on the property traded in*, but which are not
> a part of the finance charge.

815 ILL. COMP. STAT. ANN. § 375/2.8 (emphasis added).

The broad language in Comment 3 to the UCC, read alongside the broad,

inclusive categories of car purchase costs described in the MVRISA, leads the Court

to conclude that under Illinois law, negative equity is part of the "price of the

collateral," such that its presence in a transaction does not destroy that

transaction's nature as a "purchase money security interest."

4.    *A Number of Other Bankruptcy Courts, As Well As One District Court, Have
      Looked at State Law and Concluded that Negative Equity Is Part Of A
      "Purchase Money Security Interest."*

Another bankruptcy court has read its state's version of the UCC and the

MVRISA in a very similar fashion to the reading this Court lays out above.  In <u>In re

Petrocci</u>, 370 B.R. 489 (Bankr. N.D.N.Y. 2007), the bankruptcy court found that

"Official Comment 3 to [the New York version of the UCC], in a rather wide-ranging

and open-ended attempt to define 'price' in the purchase money security interest

context, explicitly states that the 'price' of the collateral may include much more

than . . . 'the actual price of the collateral being acquired.'" <u>Id.</u> at 498-99.  The

<u>Petrocci</u> court, like this Court, found compelling the "and other similar obligations"

language at the end of the longer paragraph of Comment 3.  <u>Id.</u> at 499.  And the

Petrocci court did a thorough job of parsing through the kinds of charges that Comment 3 expressly includes in the "price of the collateral," noting that those kinds of charges are not "substantially dissimilar" to negative equity.  Id.

This Court finds the Petrocci court's analysis both compelling and persuasive. And, while taking slightly different routes, other courts have found themselves at the same destination this Court reaches.  In In re Cohrs, 373 B.R. 107 (Bankr. E.D.Cal.2007), the court looked to Comment 3 of the California version of the UCC–which is identical to Comment 3 to the Illinois version.  Judge McManus noted, "True, this Comment does not expressly include amounts loaned to pay off negative equity owed on a trade-in vehicle among the charges that can be considered part of the price or value given.  The list, however, is not an exclusive one.  The Comment is merely giving examples."  Id. at 109.  Judge McManus found that paying off the negative equity on a trade-in was "part of a single transaction" in which "all of the components of the obligation incurred [were] for the purpose of acquiring the property securing the new obligation."  Id. at 110.

The Cohrs court, like this one, also read its state's version of the MVRISA in pari materia with the California UCC to reach this conclusion.  California's version of that statute differs from the Illinois version in that it includes in the definition of "cash price" the "payment of a prior creditor or lease balance remaining on the

property being traded in." Id. (quoting Cal. Civil Code § 2981(e)).[5]  The Illinois

version, as discussed above, includes such negative equity payments in the

definition of the "amount financed," rather than in the definition of "cash sale

price."  This Court, however, does not find this difference particularly relevant.  As

indicated above, the broad language in Comment 3 indicates that all three of the

categories of costs laid out in the Illinois MVRISA–the costs of purchasing the car,

the costs of borrowing the money, and the "other" costs (such as negative equity),

are part of the "price of the collateral."

In the Eastern District of Wisconsin, Judge Shapiro came to the same

conclusion, relying on Comment 3 to Wisconsin's version of the UCC–again,

identical to Comment 3 to the Illinois version. *See* In re Dunlap, 383 B.R. 113

(Bankr. E.D. Wis. 2008).  So did Judge Federman, when he looked at Missouri's

version of the comment, *see* In re Weiser, 381 B.R. 263 (Bankr. W.D. Mo. 2007), and

Judge May when he looked at Florida's version, *see* In re Schwalm, 380 B.R. 630,

633-34 (Bankr. M.D.Fla. 2008).  In In re Burt, 378 B.R. 352 (Bankr. D. Utah 2007),

Judge Thurman conducted an exhaustive review of the diverging opinions on the

issue to that point.  He then, like the courts above, relied on Utah's version of the

UCC comment to conclude that "negative equity" was part of the purchase money

security interest.  Id. at 362-63.

---

[5]  So did New York's version, as demonstrated by the district court's decision
in General Motors Acceptance Corp. v. Peaslee, 373 B.R. 252 (W.D.N.Y. 2007).

Several of these courts discussed the fact that, when a debtor trades in an old car in order to buy a new one, the debtor is engaging in a sort of "package deal" with the lender.  As such, these courts reasoned, all the parts of that "package"–the money loaned to pay sticker price, the money loaned to pay off the trade-in, the money loaned to pay for insurance and taxes and fees–are "inextricably intertwined," and are all part of the "value given to enable" the debtor to acquire ownership rights to the car.  *See*, *e.g.*, In re Burt, 378 B.R. at 363; In re Schwalm, 380 B.R. at 633-34.  This Court's reading of Comment 3 and the Illinois MVRISA comports with that notion–that when a debtor buys a car on credit, the whole package of money that she borrows is meant, by those statutes, to be the "price of the collateral," and is part of the "value" that the lender gives her to "enable" her to buy the car.

The result these courts reached has a certain intuitive logic.  If a lender has a "purchase money security interest" in collateral when it lends money to someone who uses the money to buy that collateral, it isn't immediately clear why a lender who lends additional money to allow the person to, essentially, finish buying an additional piece of collateral (the old car) would somehow lose that "purchase money security interest" as a result.  Granted, the borrower does not retain use of the additional piece of collateral–the old car goes to the dealership, not to the buyer. But the borrower *does* retain interest in the collateral that the pay-off of the old car gave her the ability to buy.

21

While the debtor in this case does not make this explicit argument, some of the cases indicate that one rationale debtors have advanced for the proposition that negative equity destroys a purchase money security interest is the argument that borrowing money to pay off the loan on the trade-in is not necessary (at least, in some cases) for the debtor to purchase the vehicle. In other words, the debtor *must* pay the sticker price in order to get the car. But she is not *required* to trade in her old car and pay off its lien–that's a choice she makes to try to reduce the cost of buying the new vehicle. This argument intimates that any money a lender advances to pay for anything that is not absolutely required for the borrower to drive the vehicle off the lot destroys the purchase money nature of the security interest.

This argument does not make sense to the Court, for reasons that the Petrocci court articulated. The Petrocci court pointed out that Comment 3 included a number of items in "price of the collateral" that were not absolutely required for the borrower to drive the car off the lot, such as freight charges, costs of storage in transit, expenses of collection and enforcement. In re Petrocci, 370 B.R. at 499. If a borrower were to drive the car from the lot, no freight charges, costs of storage or demurrage would be required. Indeed, there seems to be little question that if a borrower decided to add optional air conditioning, a sun roof and cup holders to the basic car model, the fact that the lender advanced the money for these options–arguably not strictly necessary for the purchase of the vehicle itself–would

not destroy the purchase money nature of the security interest.  As the district court pointed out in General Motors Acceptance Corp. v. Peaslee, "[t]he fact that negative equity and trade-ins do not *have* to be included in a sale, and that the buyer could, in theory at least, pay off the negative equity by other means, does not require a contrary result . . . ."  373 B.R. at 259.

Judges must follow the law as legislatures have written it.  Accordingly, the fact that a particular result makes "intuitive sense" is not necessarily a reason for a court to reach that result.  In this case, however, it bolsters the conclusions this Court has reached after reviewing the relevant statutes.

The Court realizes that a number of other bankruptcy courts have, in well-reasoned and thoughtful opinions, concluded that negative equity destroys, in part or *in toto*, the purchase money security interest nature of the transaction between the lender and the debtor.  *See* In re Peaslee, 358 B.R. 545 (Bankr. W.D.N.Y. 2006), *rev'd and remanded*, General Motors Acceptance Corp. v. Peaslee, 373 B.R. 253 (W.D.N.Y. 2007); In re Blakeslee, 377 B.R. 724 (Bankr. M.D.Fla. 2007); In re Sanders, 377 B.R. 836 (Bankr. W.D.Tex. 2007); In re Conyers, 379 B.R. 576 (Bankr. M.D.N.C. 2007); Citifinancial Auto v. Hernandez-Simpson (In re Hernandez-Simpson), 369 B.R. 36 (Bankr. D. Kan. 2007); In re Acaya, 369 B.R. 564 (Bankr. N.D. Cal. 2007); In re Pajot, 371 B.R. 139 (Bankr. E.D.Va. 2007); In re Price, 363 B.R. 734 (Bankr. E.D.N.C. 2007); In re Westfall, 365 B.R. 755 (Bankr. N.D.Ohio), *aff'd in part on reh'g*, 376 B.R. 210 (Bankr. N.D.Ohio 2007)(holding that the

transformational rule did not apply);  In re Look, 383 B.R. 210 (Bankr. D. Me. 2008).

While respecting the decisions those courts reached, this Court cannot agree with them.  This Court's reading of Comment 3 and the provisions of the Illinois MVRISA compel it to conclude that the fact that a lender advances a debtor money, not only for the sticker price of her car, but for the cost of service contracts, gap insurance, taxes, application fees, and negative equity, does not deprive the lender of a "purchase money security interest" in the entire sum of money loaned.

### III.    CONCLUSION

For the foregoing reasons, the Court hereby **SUSTAINS** GMAC's objections to the debtor's first and second amended plan.  The debtor has thirty (30) days from the date of this Order to submit an amended plan that comports with this Order.

**SO ORDERED** this 25th day of June, 2008.

_____/s/ Pamela Pepper_____
UNITED STATES BANKRUPTCY JUDGE
